# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

BRIAN D. GROOM,             )
                                     )

                **Plaintiff,**     )

                                     )     **CIVIL ACTION**

**v.**                                )

                                     )     **No. 12-1172-JWL**

**CAROLYN W. COLVIN,[1]**     )
**Acting Commissioner of Social Security,**     )

                                     )

                **Defendant.**     )
_____ )

## MEMORANDUM AND ORDER

Plaintiff, appearing before the court <u>pro se</u>, seeks review of a decision of the Commissioner of Social Security (hereinafter Commissioner) denying Social Security disability(SSD) benefits under sections 216(i) and 223 of the Social Security Act. 42 U.S.C. §§ 416(i) and 423 (hereinafter the Act). Finding no error in the Commissioner's final decision, the court ORDERS that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING that decision.

## I.    Background

---

[1]On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security. In accordance with Rule 25(d)(1) of the Federal Rules of Civil Procedure, Ms. Colvin is substituted for Commissioner Michael J. Astrue as the defendant. In accordance with the last sentence of 42 U.S.C. § 405(g), no further action is necessary.

Plaintiff applied for SSD benefits on November 23, 2009, alleging disability beginning April 30, 2009. (R. 10, 118-26). The application was denied initially and upon reconsideration, whereupon Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (R. 10, 76-77, 87-89). Plaintiff's request was granted, and Plaintiff appeared without representation and testified at a hearing before ALJ Michael R. Dayton on November 23, 2010. (R. 10, 28-30). At the hearing, testimony was also taken from Norma Jean King a witness for Plaintiff, and from Cindy Younger a vocational expert. (R. 10, 28-75).

On January 28, 2011, ALJ Dayton issued his decision applying the Commissioner's five-step sequential evaluation process and finding at step one that although Plaintiff worked after his alleged onset date the work activity did not rise to the level of substantial gainful activity. (R. 12). He found at step two that Plaintiff has severe impairments including "degenerative disc disease of the cervical and lumbar spines and a history of carpal tunnel syndrome." (R. 12-15). At step three he found that Plaintiff's condition does not meet or medically equal any Listed Impairment; and specifically found that Listing 1.02 is not met because the record does not demonstrate an "extreme" limitation in the ability to ambulate effectively or to perform fine and gross movements effectively, and that Listing 1.04 is not met because the record does not demonstrate "nerve root compression or other findings that would satisfy the criteria of listing 1.04." (R. 15-16).

Before proceeding to the fourth step of the process, the ALJ assessed Plaintiff's residual functional capacity (RFC) and found that he is able to perform a range of light work as defined in 20 C.F.R. § 404.1567(b), further limited by the need to avoid concentrated exposure to vibrations and workplace hazards, and the ability to climb ladders, ropes, and scaffolds only occasionally. (R. 16-20). In assessing RFC, the ALJ considered the credibility of Plaintiff's allegations of symptoms resulting from his impairments, and found his "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible." (R. 17). He also considered the medical opinions, according "little weight" to the non-treating source opinion of Dr. Smith, a psychologist who examined Plaintiff, and "significant weight" to the non-examining source opinions of Dr. Wilkinson and Dr. Coleman, a state agency psychological consultant and medical consultant, respectively, who reviewed the record and opined regarding Plaintiff's abilities and limitations. (R. 14, 19). Finally, he considered the written lay opinions provided by Mr. Dyke and Mr. Geeting and the lay opinion testimony of Ms. King at the hearing, and accorded them "little weight." (R. 19-20).

The ALJ found at step four of the sequential evaluation process that Plaintiff has past relevant work as a sporting goods sales clerk, and that based upon the RFC assessed, Plaintiff is still able to perform that work, not as he actually performed it, but as it is generally performed in the national economy. (R. 20.) Although the ALJ might have ended his analysis at step four and found Plaintiff not disabled on that basis, he continued his analysis and made an alternative finding at step five that, considering Plaintiff's age,

education, work experience, and RFC, other jobs exist in significant numbers in the national economy that Plaintiff can perform, represented by light jobs such as an injection-molding-machine tender or a subassembler; and by sedentary jobs such as a semiconductor bonder, or a microfilming document preparer.  (R. 20-22).

Because he found that there are jobs in the economy that Plaintiff can perform, the ALJ found that Plaintiff is "not disabled" within the meaning of the Act.  (R. 22). Consequently, he denied Plaintiff's application for SSD benefits.  Id.  Plaintiff requested Appeals Council review of the ALJ's decision, and submitted briefs and additional evidence explaining his reasons for disagreeing with the decision.  (R. 6).  The Council made the additional evidence a part of the administrative record in the case and considered it in deciding whether to review the decision.  (R. 1-5).  Nevertheless, it determined that the additional evidence "does not provide a basis for changing the Administrative Law Judge's decision" (R. 2), found no reason under the rules of the Social Security Administration to review the decision, and denied Plaintiff's request for review.  (R. 1).  Therefore, the ALJ's decision became the final decision of the Commissioner; (R. 1); Blea v. Barnhart, 466 F.3d 903, 908 (10th Cir. 2006); and Plaintiff now seeks judicial review.  (Doc. 1).

## II.    Legal Standard

The court's jurisdiction and review are guided by the Act.  Weinberger v. Salfi, 422 U.S. 749, 763 (1975) (citing 42 U.S.C. § 405(g)); Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009) (same); Brandtner v. Dep't of Health and Human Servs., 150 F.3d

1306, 1307 (10th Cir. 1998) (sole jurisdictional basis in social security cases is 42 U.S.C.

§ 405(g)). Section 405(g) of the Act provides for review of a final decision of the

Commissioner made after a hearing in which the plaintiff was a party. It also provides

that in judicial review "[t]he findings of the Commissioner as to any fact, if supported by

substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The court must determine

whether the ALJ's factual findings are supported by substantial evidence in the record

and whether he applied the correct legal standard. Lax v. Astrue, 489 F.3d 1080, 1084

(10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001).

Substantial evidence is more than a scintilla, but it is less than a preponderance; it is such

evidence as a reasonable mind might accept to support a conclusion. Richardson v.

Perales, 402 U.S. 389, 401 (1971); Wall, 561 F.3d at 1052; Gossett v. Bowen, 862 F.2d

802, 804 (10th Cir. 1988). The court may "neither reweigh the evidence nor substitute

[its] judgment for that of the agency." Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir.

2008) (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir.

1991)); accord, Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005).

When deciding if substantial evidence supports the ALJ's decision, the mere fact

that there is evidence in the record which might support a contrary finding will not

establish error in the ALJ's determination. "The possibility of drawing two inconsistent

conclusions from the evidence does not prevent an administrative agency's findings from

being supported by substantial evidence. [The court] may not displace the agency's

choice between two fairly conflicting views, even though the court would justifiably have

made a different choice had the matter been before it de novo." Lax, 489 F.3d at 1084 (citations, quotations, and bracket omitted); see also, Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and noting that "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."). Nonetheless, the determination whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion. Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

An individual is disabled only if he can establish that he has a physical or mental impairment which prevents him from engaging in any substantial gainful activity, and which is expected to result in death or to last for a continuous period of at least twelve months. Knipe v. Heckler, 755 F.2d 141, 145 (10th Cir. 1985) (quoting identical definitions of a disabled individual from both 42 U.S.C. §§ 423(d)(1) and 1382c(a)(3)(A)); accord, Lax, 489 F.3d at 1084. The claimant's impairments must be of such severity that he is not only unable to perform his past relevant work, but cannot, considering his age, education, and work experience, engage in any other substantial gainful work existing in the national economy. 42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step sequential process to evaluate disability.  20

C.F.R. § 404.1520 (2010);[2] Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010)

(citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)).  "If a determination can

be made at any of the steps that a claimant is or is not disabled, evaluation under a

subsequent step is not necessary."  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at

1084).  In the first three steps, the Commissioner determines whether claimant has

engaged in substantial gainful activity since the alleged onset, whether he has a severe

impairment(s), and whether the severity of his impairment(s) meets or equals the severity

of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1).

Williams, 844 F.2d at 750-51.  After evaluating step three, the Commissioner assesses

claimant's RFC.  20 C.F.R. § 404.1520(e).  This assessment is used at both step four and

step five of the sequential evaluation process.  Id.

The Commissioner next evaluates steps four and five of the sequential process--

determining at step four whether, in light of the RFC assessed, claimant can perform his

past relevant work; and at step five whether, when also considering the vocational factors

of age, education, and work experience, claimant is able to perform other work in the

economy.  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In steps one

through four the burden is on Plaintiff to prove a disability that prevents performance of

[2]Because the Commissioner's decision was issued on January 28, 2011, all citations to the Code of Federal Regulations in this opinion refer to the 2010 edition of 20 C.F.R. Parts 400 to 499, revised as of April 1, 2010, unless otherwise indicated.

past relevant work.  Blea, 466 F.3d 903, 907 (10th Cir. 2006); accord, Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2.  At step five, the burden shifts to the Commissioner to show that there are jobs in the economy which are within the RFC assessed.  Id.; Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999).

Plaintiff claims the ALJ erred at step three in finding that his impairments do not meet or medically equal the severity of a listed impairment, erred in weighing the opinions of Dr. Smith and Dr. Coleman, erred in evaluating the credibility of Plaintiff's allegations of symptoms resulting from his impairments, and erred in assessing his RFC.[3] Plaintiff also "is requesting to use the date 11-23-2008, for a starting date of disability as opposed to the April 1, 2009, the date the SSA placed on his application for disability as they [assessed] it from the last day the plaintiff worked full time."  (Pl. Br. 23).  The Commissioner argues that the ALJ properly found that the severity of Plaintiff's impairments does not meet or medically equal a Listed Impairment, that he properly considered the record medical opinions, that he performed a proper credibility evaluation, and that he properly assessed RFC based upon all of the relevant record evidence.  She also argues that the ALJ properly determined Plaintiff's alleged onset date and that Plaintiff should not be allowed to amend his alleged onset date.

_____

[3]Because Plaintiff proceeds pro se before this court, the court construes his pleadings liberally.  Haines v. Kerner, 404 U.S. 519, 520-21 (1972); Travis v. Park City Mun. Corp., 565 F.3d 1252, 1254 (10th Cir. 2009).  But, the court will not assume the role of advocate for Plaintiff.  Garrett v. Selby Conner Maddux & Janer, 425 F.3d 836, 840 (10th Cir. 2005).

The court finds no error in the ALJ's evaluation. It begins it analysis by considering the ALJ's step three evaluation and then proceeds to consider the RFC assessment and the components thereof--evaluation of credibility and evaluation of the opinion evidence. Because the court finds no error in the Commissioner's determination that Plaintiff is not disabled, the alleged date of disability onset is moot, and the court does not consider the parties' arguments regarding the alleged onset date of disability.

## III.    Step Three Determination

Plaintiff argues that "there is no standard or Appendix or application that shows an exact list of what 'meets or equals' a listed impairment. However, there is a law that defines what is expected should a non-listed impairment exist. The plaintiff will break this law down into seven segments to find a point of 'meet or equal.'" (Pl. Br. 8, ¶34). He then applies 20 C.F.R. § 404.1505(a) in seven steps to assert that as a matter of law his condition "meets or equals" a medical condition that precludes light work, and further, that because he is over fifty years of age, the ALJ should have found him disabled. (Pl. Br. 9-14). He then argues that in any case his condition meets Listing 1.04 for lumbar spinal stenosis, spondylolisthesis, or degenerative disc disease "that runs the entire length of his spine." Id. at 14-17. The Commissioner argues that the ALJ properly found that Plaintiff's condition does not meet or medically equal a Listed Impairment because although the record demonstrates a diagnosis of cervical spinal stenosis while he was still working before his alleged onset date, Plaintiff does not point to record evidence showing a diagnosis of lumbar spinal stenosis, and in any case he cannot show nerve root

compression or the inability to ambulate effectively as is required to meet Listing 1.04. (Comm'r Br. 12-13). Further, the Commissioner argues, the ALJ considered and explained why Plaintiff's condition does not meet or equal the criteria of other impairments in Listings 1.02 and 1.04. Id. at 13-14.

## A.    Standard for Evaluating Step Three and Listing 1.04

The Commissioner has provided a "Listing of Impairments" which describes certain impairments that she considers disabling. 20 C.F.R. § 404.1525(a); see also, Pt. 404, Subpt. P, App. 1 (Listing of Impairments). If plaintiff's condition meets or equals the severity of a listed impairment, that impairment is conclusively presumed disabling. Williams, 844 F.2d at 751; see Bowen v. Yuckert, 482 U.S. 137, 141 (1987) (if claimant's impairment "meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled"). However, plaintiff "has the burden at step three of demonstrating, through medical evidence, that his impairments 'meet all of the specified medical criteria' contained in a particular listing." Riddle v. Halter, No. 00-7043, 2001 WL 282344 at *1 (10th Cir. Mar. 22, 2001) (quoting Sullivan v. Zebley, 493 U.S. 521, 530 (1990) (emphasis in Zebley)); see also, Thompson v. Sullivan, 987 F.2d 1482, 1487 (10th Cir. 1993) (burden shifts to Commissioner only at step five). "An impairment that manifests only some of [the listing] criteria, no matter how severely, does not qualify" to meet or equal the listing. Zebley, 493 U.S. at 530. Medical equivalence to a listing may be established by showing that the claimant's impairment(s) "is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). The

determination of medical equivalence is made without consideration of vocational factors

of age, education, or work experience.  20 C.F.R. § 404.1526(c).

"The [Commissioner] explicitly has set the medical criteria defining the listed

impairments at a higher level of severity than the statutory standard.  The listings define

impairments that would prevent an adult, regardless of his age, education, or work

experience, from performing <u>any</u> gainful activity, not just 'substantial gainful activity.'"

<u>Zebley</u>, 493 U.S. at 532-33 (emphasis in original) (citing 20 C.F.R. § 416.925(a) (1989)).

The listings "streamlin[e] the decision process by identifying those claimants whose

medical impairments are so severe that it is likely they would be found disabled

regardless of their vocational background."  <u>Yuckert</u>, 482 U.S. at 153.  "Because the

Listings, if met, operate to cut off further detailed inquiry, they should not be read

expansively."  <u>Caviness v. Apfel</u>, 4 F. Supp. 2d 813, 818 (S.D. Ind. 1998).

Listing 1.04 deals with disorders of the spine:

1.04 <u>Disorders of the spine</u> (e.g., herniated nucleus pulposus, spinal
arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet
arthritis, vertebral fracture) resulting in compromise of a nerve root
(including the cauda equina) or the spinal cord.

With:

A. Evidence of nerve root compression characterized by neuro-anatomic
distribution of pain, limitation of motion of the spine, motor loss (atrophy
with associated muscle weakness or muscle weakness) accompanied by
sensory or reflex loss and, if there is involvement of the lower back,
positive straight-leg raising test (sitting and supine); or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report
of tissue biopsy, or by appropriate medically acceptable imaging,

manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R., Pt. 404, Subpt. P, App. 1.

As Listing 1.04 quoted above reveals, the criteria of Listing 1.04 include (I) a disorder of the spine, which causes compromise of (1) a nerve root, or (2) the spinal cord, with either (A) nerve root compression, (B) spinal arachnoiditis, or (C) lumbar spinal stenosis. The criteria of Listing 1.04A (nerve root compression) are: (i) neuro-anatomic distribution of pain, (ii) limitation of motion of the spine, (iii) motor loss accompanied by either (a) sensory loss, or (b) reflex loss, and (if the lower back is involved) (iv) positive straight-leg raising, either while (a) sitting or (b) supine. Listing 1.04B requires the presence of spinal arachnoiditis which is (i) confirmed by (a) operative note or (b) tissue biopsy, and which is (ii) manifested by (a) severe burning or (b) painful dysesthesia, and which (iii) produces the need to change (a) position or (b) posture more frequently than every two hours. Finally, the criteria of Listing 1.04C are lumbar spinal stenosis (i) resulting in pseudoclaudication, (ii) established by findings on appropriate medically acceptable imaging, (iii) manifested by (a) chronic nonradicular pain and (b) weakness, and (iv) resulting in inability to ambulate effectively.

**B.** **Analysis**

12

First, the court notes that in his primary argument Plaintiff applies the incorrect law to decide that his condition meets or equals a condition which precludes light work. As Plaintiff appears to recognize, 20 C.F.R. § 404.1505(a) is the "basic definition of disability." 20 C.F.R. 404.1505. Moreover, Plaintiff quotes Soc. Sec. Ruling (SSR) 00-4p for the proposition that, "To determine whether an individual applying for disability benefits . . . is disabled, we follow a 5-step sequential evaluation process." (Pl. Br. 6, ¶26); see also, SSR 00-4p West's Soc. Sec. Reporting Serv., Rulings 243 (Supp. 2012). Plaintiff also quotes the five step sequential evaluation process as stated in SSR 00-4p. (Pl. Br. 6-7). This process was promulgated by the Commissioner in notice and comment rulemaking codified at 20 C.F.R. 404.1420, and has been accepted as the standard for evaluating disability in the Tenth Circuit for many years. E.g., Newbold v. Colvin, — F.3d —, —, 2013 WL 2631530 (10th Cir. 2013); Wilson, 602 F.3d at 1139; Williams, 844 F.2d at 750; Talbot v. Heckler, 814 F.2d 1456, 1460 (10th Cir. 1987).

Whether the claimant's impairment(s) meets or equals the severity of an impairment listed in Appendix 1 of Subpart P, of 20 C.F.R. Part 404 is the determination which is made at step three of the five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(4)(iii). Moreover, the regulations define "medical equivalence" to a listed impairment in 20 C.F.R. § 404.1526. Although Plaintiff is correct that there is no "exact list of what 'meets or equals' a listed impairment" (Pl. Br. 8), he is mistaken when he asserts that there is no standard, appendix, or application to make that determination. 20 C.F.R., Pt. 404, Subpt. P, App. 1 contains the Listing of Impairments, which provides the

criteria to be met for each Listed Impairment, and 20 C.F.R. § 404.1526 explains the

standard to be applied to determine medical equivalence--whether the Listing is equaled.

Therefore, Plaintiff's attempted application of the definition of disability from 20 C.F.R.

§ 404.1505 to make the step three "meets or equals" determination is erroneous.

Nonetheless, Plaintiff's appeal to Listing 1.04 is appropriate, and the court will determine

whether the ALJ properly determined that Listing 1.04 is not met or equaled in the

circumstances of this case.

In his step three analysis, the ALJ noted that Plaintiff has musculoskeletal

impairments. (R. 15); see also (R. 12) (finding degenerative disc disease--a back disorder

enumerated in Listing 1.04). But, he found that Plaintiff "does not have an "extreme"

limitation in the ability to ambulate effectively." Id. He went on to explain that,

"Although the claimant has a severe back impairment, there is no evidence that at any

time the claimant has been unable to walk without the use of a walker, canes, or crutches

or that he has an extreme limitation in the ability to ambulate effectively." Id. With

regard to Listing 1.04A (nerve root compression), the ALJ noted that listing was not met

because Plaintiff "does not have one of the listed disorders . . . **in conjunction with**

evidence of nerve root compression characterized by neuro-anatomic distribution of pain,

limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or

muscle weakness) accompanied by sensory or reflex loss, and, in connection with the

lumbar spine impairment, also a positive straight leg raising test (sitting and supine)." (R.

16) (emphasis in original).

Plaintiff properly does not argue that Listing 1.04B (spinal arachnoiditis) is met here because there is simply no record evidence of such an impairment. However, he specifically argues that Listing 1.04C (lumbar spinal stenosis) is met (Pl. Br. 14, 15, 18), and in his Reply Brief he suggests that Listing 1.04A (nerve root compression) is met. (Pl. Reply 5-6). The problem with Plaintiff's arguments is that he does not demonstrate that all of the criteria for either Listing 1.04A or 1.04C are met as Zebley requires.

Listing 1.04C requires lumbar spinal stenosis (ii) established by findings on appropriate medically acceptable imaging, (i) resulting in pseudoclaudication, (iii) manifested by (a) chronic nonradicular pain and (b) weakness, and (iv) resulting in inability to ambulate effectively. To establish Listing 1.04C plaintiff points to an x-ray report showing chronic grade 1 spondylolisthesis at L5-S1 with sclerosis, but stating that the "remainder of the lumbar spine is normal." (Pl. Br. 8) (quoting R. 510). Plaintiff asserts, without citation to any authority, that grade 1 spondylolisthesis equates to a 25% closure of the spinal canal, and that his "lack of ability to ambulate was documented as being 'antalgic' by Dr. Milton H. Landers" in May 2008. (Pl. Br. 15) (citing R. 440). He then asserts that "This means the plaintiff has met the requirements of 20 CFR Part 404, Subpart P, Appendix 1, 1.04C and 1.00(B)(2)(b)." Id. 15. Contrary to Plaintiff's assertion, he has not established that all of the criteria of Listing 1.04C are met. First, he has not shown that grade 1 spondylolisthesis at L5-S1 equates to "lumbar spinal stenosis" or that the x-ray reports relied upon are "appropriate medically acceptable imaging" upon which such stenosis might be "established." Moreover, he has not shown that an

15

"antalgic" gait equates to an "inability to ambulate effectively," or that the "antalgic" gait referred to by Dr. Landers results from lumbar stenosis.

Even if the court were to assume that these four facts had been established by Plaintiff, and that the pain and weakness testified by Plaintiff were "chronic nonradicular pain and weakness" sufficient to manifest lumbar spinal stenosis, Plaintiff has not shown pseudoclaudication resulting from lumbar spinal stenosis. Moreover, as the ALJ's decision suggests, the regulations define "inability to ambulate effectively," as "an extreme limitation in the ability to walk . . . having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of <u>both upper extremities</u>." 20 C.F.R., Pt. 404, Subpt. P, App. 1 § 1.00B(2)(b)(1)(emphasis added). The regulations explain:

> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R., Pt. 404, Subpt. P, App. 1 § 1.00B(2)(b)(2). Plaintiff has not shown the <u>extreme</u> limitation in the ability to walk contemplated by the regulations.

His assertion that Dr. Landers's finding of "antalgic" gait shows an inability to ambulate effectively is without merit. Antalgic gait is not an <u>extreme</u> limitation in the ability to walk. It is defined as "a characteristic g[ait] resulting from pain on weightbearing in which the stance phase of g[ait] is shortened on the affected side." Stedman's Medical Dictionary, 698 (26th Ed. 1995). A shortened stance on one side when walking is not the sort of "extreme limitation in the ability to walk" necessary to establish the inability to ambulate effectively. Beyond his mere assertion, Plaintiff has not shown, and the record evidence does not support, that Listing 1.04C is met here.

Although the court need not consider an argument raised for the first time in a reply brief, <u>Stump v. Gates</u>, 211 F.3d 527, 533 (10th Cir. 2000), because of his <u>pro se</u> status the court has nonetheless considered Plaintiff's suggestion that his condition meets Listing 1.04A, nerve root compression. Nevertheless, Plaintiff has not shown that he has neuro-anatomic distribution of pain, motor loss, sensory or reflex loss, or a positive straight-leg raising test. He has not shown that Listing 1.04A is met in this case.

With regard to whether Plaintiff's condition <u>equals</u> the criteria of one of the subsections of Listing 1.04, Plaintiff does not point to facts in the record which establish that his impairments are "at least equal in severity and duration to the criteria of" Listing 1.04 as required to show medical equivalence to the Listing. 20 C.F.R. § 404.1526. Plaintiff has shown no error in the ALJ's step three analysis.

**IV.    Credibility**

Plaintiff claims that the ALJ erred in finding that his allegations of disabling symptoms are not credible. He bases this claim on several facts: that Dr. Smith, an examining psychologist, stated he had no reason to doubt Plaintiff's credibility (Pl. Br. 22); that it is improper to discount credibility merely because of a lack of objective evidence, id. at 18; and that "the court should not give weight to that which cannot be credibly established, such as the ALJ finding the plaintiff 'less than credible,' especially since it was established by an improper assessment or unjust bias." Id. at 23 (quoting R. 17). Plaintiff concludes by asserting that he "is not a malinger[er], but has credible 'symptoms.'" Id. at 24. The Commissioner argues that Plaintiff's arguments are without merit, that the ALJ applied the correct legal standard to his credibility determination, and that the record evidence supports his determination. (Comm'r Br. 15-20).

## A.     Standard for Evaluating Credibility

An ALJ's credibility determinations are generally treated as binding on review. Talley v. Sullivan, 908 F.2d 585, 587 (10th Cir. 1990); Broadbent v. Harris, 698 F.2d 407, 413 (10th Cir. 1983). "Credibility determinations are peculiarly the province of the finder of fact" and will not be overturned when supported by substantial evidence. Wilson, 602 F.3d at 1144; accord Hackett, 395 F.3d at 1173. Therefore, in reviewing the ALJ's credibility determinations, the court will usually defer to the ALJ on matters involving witness credibility. Glass v. Shalala, 43 F.3d 1392, 1395 (10th Cir. 1994); but see Thompson, 987 F.2d at 1490 ("deference is not an absolute rule"). "However, '[f]indings as to credibility should be closely and affirmatively linked to substantial

evidence and not just a conclusion in the guise of findings.'" Wilson, 602 F.3d at 1144

(quoting Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988)); Hackett, 395 F.3d at

1173 (same).

The Tenth Circuit has explained the analysis for considering subjective testimony

regarding symptoms. Thompson, 987 F.2d at 1488 (dealing specifically with pain).

> A claimant's subjective allegation of pain is not sufficient in itself to
> establish disability. Before the ALJ need even consider any subjective
> evidence of pain, the claimant must first prove by objective medical
> evidence the existence of a pain-producing impairment that could
> reasonably be expected to produce the alleged disabling pain. This court
> has stated: The framework for the proper analysis of Claimant's evidence
> of pain is set out in Luna v. Bowen, 834 F.2d 161 (10th Cir. 1987). We
> must consider (1) whether Claimant established a pain-producing
> impairment by objective medical evidence; (2) if so, whether there is a
> "loose nexus" between the proven impairment and the Claimant's
> subjective allegations of pain; and (3) if so, whether, considering all the
> evidence, both objective and subjective, Claimant's pain is in fact disabling.

Id. (citations and quotation omitted).

In evaluating credibility, the court has recognized a non-exhaustive list of factors

which should be considered. Luna, 834 F.2d at 165-66; see also 20 C.F.R.

§ 404.1529(c)(3). These factors include:

> the levels of medication and their effectiveness, the extensiveness of the
> attempts (medical or nonmedical) to obtain relief, the frequency of medical
> contacts, the nature of daily activities, subjective measures of credibility
> that are peculiarly within the judgment of the ALJ, the motivation of and
> relationship between the claimant and other witnesses, and the consistency
> or compatibility of nonmedical testimony with objective medical evidence.

Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995) (quoting Thompson, 987 F.2d at

1489). The Commissioner has promulgated regulations suggesting relevant factors to be

considered in evaluating credibility which overlap and expand upon the factors stated by the court: Daily activities; location, duration, frequency, and intensity of symptoms; factors precipitating and aggravating symptoms; type, dosage, effectiveness, and side effects of medications taken to relieve symptoms; treatment for symptoms; measures plaintiff has taken to relieve symptoms; and other factors concerning limitations or restrictions resulting from symptoms. 20 C.F.R. § 404.1529(c)(3)(i-vii).

### B.     The ALJ's Analysis

The ALJ stated he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p." (R. 16). He explained that the cited regulation and rulings require him to determine whether Plaintiff has a medically determinable impairment(s) "that could reasonably be expected to produce" the symptoms alleged by Plaintiff. Id. He noted that if an impairment is shown which might reasonably produce the alleged symptoms, he must consider "the entire case record" to determine the credibility of Plaintiff's statements regarding the intensity, persistence, and limiting effects of the symptoms. (R.16). Next, he made his credibility analysis, and thereafter explained that although he found that the symptoms alleged might potentially be produced by Plaintiff's impairments, he had considered all of the record evidence and found that in light of this analysis Plaintiff's allegations of symptoms of disabling severity are not credible. (R. 16-17). The court finds the ALJ's credibility analysis clear and thorough and includes it here

with numbering added to aid in identification and discussion of the reasons given by the

ALJ to justify his credibility determination:

> The claimant reported that his "disability" began in May 2007; however, [(1)] the claimant worked until April 2009 (Exhibit 16E, p.10 [(R. 233)]). Additionally, based on the medical records and the claimant's reports, [(2)] the claimant appears to have experienced more significant symptoms while he was working.  As the claimant's symptoms did not prevent him from working at that time, there is a strong suggestion that these symptoms do not now prevent work.  Additionally, [(3)] there is evidence that the claimant stopped working for reasons not related to the allegedly disabling impairments when the store he was working at closed.

> Furthermore, [(4)] the claimant continues to engage in activities requiring more exertional abilities than those required for the light work specified in the residual functional capacity.  Additionally, [(5)] many of the limitations alleged by the claimant require greater functional abilities than required for light work.  This certainly suggests the claimant is capable of performing the work described by the vocational expert under the residual functional capacity found in this case.  This also indicates the claimant is not incapable of work, as he alleges.

> In addition, [(6)] despite the complaints of allegedly disabling symptoms, the claimant has not taken any medications for those symptoms.  In particular, although the claimant alleges disabling levels of back and neck pain, he does not take any prescription pain medication.  The claimant did undergo surgery for the alleged neck impairment, which certainly suggests that the symptoms were genuine.  While that fact would normally weigh in the claimant's favor, it is offset by the fact that [(7)] the record reflects that the surgery was generally successful in relieving the symptoms. Furthermore, [(8)] although the claimant testified that his pain reoccurred and increased after surgery, and that such an outcome was not unexpected, there is no indication of this in the medical record.

> Finally, [(9)] the claimant's description of symptoms has been quite vague and general, lacking the specificity that might otherwise make it more convincing.  The vagueness of the claimant's allegations has also been noted by at least one of his medical providers (Exhibit IF, p.l [(R. 352)]).

> As a result, the undersigned finds the claimant's allegations pertaining to his inability to work less than credible.

(R. 16-17) (numbering added). After making his credibility analysis, the ALJ completed his RFC assessment and summary of the record evidence--including plaintiff's allegations and reports, the medical evidence, the hearing testimony, and the opinion evidence. (R. 17-20).

### C.    Analysis

The court first notes that the ALJ applied the correct legal standard. He recognized that Plaintiff had shown medically determinable impairments which could produce the symptoms alleged--Luna factor 1 (symptom producing impairment). He found that Plaintiff's impairments might reasonably be expected to cause the symptoms alleged--Luna factor 2 (a loose nexus). So, he considered all of the evidence--Luna factor 3. Moreover, the ALJ's findings are closely and affirmatively linked to the record evidence. For example, reason number 1 cites to page 10 of the "Independent Medical Examination" prepared by Plaintiff in which he acknowledge that he "was laid off in April 2009" from Sportsman's Warehouse where he had worked since October 2007, but as the ALJ noted, in the same document Plaintiff asserted, "My date of disability is May 2007." (R. 233). Reason number 3 is also supported by Plaintiff's statement in the same document that he was laid off in April 2009. In fact, the court's review of the record reveals that the evidence supports each reason given. Plaintiff points to other record evidence suggesting otherwise, but the weighing of the evidence and the determination of

credibility are both matters for the ALJ in the first instance. The court may not reweigh the evidence nor substitute its judgment for that of the agency. Bowman, 511 F.3d at 1272; accord, Hackett, 395 F.3d at 1172. "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo, 383 U.S. at 620.

Plaintiff's arguments do not show error in the ALJ's analysis. As Plaintiff argues, Dr. Smith provided a credibility assessment regarding Plaintiff's statement of symptoms in the report of Dr. Smith's mental status exam, in which he stated that "Mr. Groom appeared open and honest, and I have no reason to doubt his credibility." (R. 401). Plaintiff argues that it was error for the ALJ to ignore Dr. Smith's statement because, "While the ALJ may choose between conflicting medical opinions or reject a medical opinion that is clearly contradicted by substantial medical evidence, he is not free to set his own expertise against that of a physician who had personally examined the claimant." (Pl. Br. 22) (quoting Alvarez v. Califano, 483 F. Supp. 1284, 1285 (E.D. Penn. 1980) (quotations, brackets, and emphasis omitted). While Plaintiff is correct that an ALJ may not substitute his opinion for the medical opinion of a physician or psychologist, an opinion regarding credibility is not a medical opinion. The regulations define "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [claimant's] impairment(s), including [claimant's] symptoms, diagnosis and prognosis, what [claimant] can still do

despite impairment(s), and [claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2).

Dr. Smith's statement that he had no reason to doubt Plaintiff's credibility is simply not a medical opinion. The statement does not address the nature and severity of Plaintiff's impairments, symptoms, diagnosis, or prognosis; it does not address what Plaintiff can still do; and it does not address Plaintiff's physical or mental restrictions. Moreover, a medical source's determination of issues reserved to the Commissioner will not be given any special significance or controlling weight. 20 C.F.R. § 404.1527(e)(2 & 3); SSR 96-5p, West's Soc. Sec. Reporting Serv. 123-24 (Supp. 2012); SSR 96-8p, West's Soc. Sec. Reporting Serv. 150, n.8 (Supp. 2012). Evaluation of the credibility of a claimant's allegations of symptoms is just such an issue reserved to the Commissioner and delegated to the ALJ. SSR 96-7p, West's Soc. Sec. Reporting Serv. 133-42 (Supp. 2012). Moreover, the Tenth Circuit has long recognized in Social Security cases that "[c]redibility determinations are peculiarly the province of the finder of fact." E.g., Newbold, — F.3d at —, 2013 WL 2631530; Wilson, 602 F.3d at 1144; Hackett, 395 F.3d at 1173; Kepler, 68 F.3d at 391; Diaz v. Sec'y of Health & Human Servs., 898 F.2d 774, 777 (10th Cir. 1990). An ALJ is never bound by the opinion of a medical source regarding credibility, and it was not error for the ALJ in this case to make a determination contrary to the opinion of Dr. Smith regarding the credibility of Plaintiff's allegations.

Plaintiff's argument that the ALJ may not discount Plaintiff's allegations merely because of a lack of objective evidence, while true, is irrelevant in this case because, as

the analysis quoted by the court makes clear, the ALJ did not base his finding of incredibility on a lack of objective evidence. To be sure, when expressing the standard applied in evaluating credibility the ALJ noted that "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record." (R. 16). But, that was the ALJ's statement of part of the applicable legal standard, not his statement of the basis for discounting Plaintiff's allegations. Rather, he considered all of the evidence, both subjective and objective, and as reflected in the nine reasons quoted above, he discredited Plaintiff's subjective complaints because they were inconsistent with the record as a whole.

Plaintiff's assertion that the ALJ's credibility finding "was established by an improper assessment or unjust bias" (Pl. Br. 23), is without support in the record. As noted above, the credibility finding was, in fact, based upon a proper assessment. Further, Plaintiff does not point to, and the court does not find, any evidentiary basis for Plaintiff's assertion that the ALJ was biased in his determination. Finally, Plaintiff's concluding assertion that he is not a malingerer and has credible symptoms, does not change the fact that the ALJ's credibility finding is supported by substantial record evidence as quoted herein. Plaintiff has shown no error in the ALJ's credibility determination.

## V.    Opinion Evidence

Plaintiff claims that the ALJ erred in giving no weight to the statements of Mr. Dyke and Mr. Geeting, or to the testimony of Ms. King. (Pl. Br. 4, 22, 23). He also claims the ALJ erred in weighing the medical opinion of Dr. Coleman. Id. at 20-21.

**A.      The ALJ's Weighing of the Opinion Evidence**

The ALJ explained the weight he accorded each of the opinions at issue:

An opinion was provided on behalf of the State Disability Determination Service by Gary W. Coleman, M.D., based on a review of the claimant's medical records (Exhibit 17F [(R. 517)]). This opinion indicated the claimant has the limitations and abilities described in the residual functional capacity. This is consistent with the longitudinal medical records, the claimant's activities of daily living, and the limited objective findings and treatment notes present after the claimant's alleged onset date. As a result, the undersigned gives this opinion significant weight.

The opinion provided by Darrel Dyke indicates the claimant was unable to work for eight-hours a day or on consecutive days (Exhibit 21E, p.1 [(R. 238)]). However, Mr. Dyke's opinion appears to be based on more physically demanding work than the work described in the residual functional capacity. Additionally, this opinion is a lay opinion based on casual observation rather than objective medical and testing. It certainly does not outweigh the accumulated medical evidence regarding the extent to which the claimant's limitations can reasonably be considered a result of her [sic] determinable impairments. As a result, the undersigned gives this opinion little weight.

A statement was also provided by Wayne Geeting, the claimant's neighbor (Exhibit 22E [(R. 239)]). Mr. Geeting indicated that he observed the claimant having difficulty walking. However, he specified that this was only after the claimant had been working or engaging in activities for long periods. This does not suggest the claimant is incapable of walking, and, given the extent of the activities the claimant continues to engage in, does not indicate the claimant would necessarily have difficulty after engaging in light work for a significant amount of time. Furthermore, this opinion is a lay opinion based on casual observation rather than objective medical and testing. It certainly does not outweigh the accumulated medical evidence regarding the extent to which the claimant's limitations can reasonably be

considered a result of her [sic] determinable impairments.  As a result, the undersigned gives this opinion little weight.

An opinion was also provided by Ms. King, the claimant's witness at the hearing.  She indicated the claimant was only able to work for three to four hours at a time.  However, as discussed above, this appears to concern his ability to work at a higher exertional level than determined in the claimant's residual functional capacity.  As a result, this opinion is given little weight.

(R. 19-20).

### B.    Lay Opinion Evidence

In the Tenth Circuit, an ALJ is not required to make specific, written findings regarding lay opinion evidence so long as the written decision reveals that the ALJ considered that opinion.  Blea, 466 F.3d at 914-15; Adams v. Chater, 93 F.3d 712, 715 (10th Cir. 1996).  Here, as quoted above, the ALJ made specific written findings regarding the weight given to each lay opinion.

Plaintiff, however, notes that Mr. Dyke and Mr Geeting opined that Plaintiff is unable to "work or ambulate all day long" (Pl. Br. 4), and argues that if the ALJ doubted them he should have asked for more information because "[t]here was no contradictory evidence asked for or submitted."  (Pl. Br. 23).  The decision as quoted above reveals that the ALJ did not doubt Mr. Dyke's opinion or Mr. Geeting's opinion in so far as each opinion asserted that each individual had observed that Plaintiff was unable to perform certain work for an entire day or on a continuous basis.  Rather, the ALJ understood the opinions to be based upon the fact that Mr. Dyke and Mr. Geeting observed that Plaintiff could not work a full day when he was performing work which was more strenuous than

work which was consistent with the RFC assessed by the ALJ.  Therefore, he accorded these opinions little weight because they did not address the question of Plaintiff's ability to perform work at the light RFC assessed.

In the facts presented, there was no need for the ALJ to ask for more information of Mr. Dyke or Mr. Geeting.  Moreover, the record supports the ALJ's understanding. Mr. Dyke explained that the work he had observed Plaintiff perform was work around Mr. Dyke's house as a handyman because he knew Plaintiff had built his own house in the past.  (R. 238).  It is reasonable and appropriate for the ALJ to determine that this work was more strenuous than the RFC for light work assessed by the ALJ.

The opinion of Mr. Geeting is a closer question.  Mr. Geeting opined that Plaintiff's "ability to walk seems to be affected when he has been working or doing activities for a long period of time."  (R. 239).  As quoted above, the ALJ explained that Mr. Geeting's opinion does not suggest that Plaintiff is incapable of walking.  (R. 20). Moreover, he explained that in light of the strenuous activities Plaintiff engages in, Mr. Geeting's opinion does not suggest Plaintiff "would necessarily have difficulty after engaging in light work for a significant amount of time."  (R. 20) (emphases added). Given that weighing the evidence is the ALJ's duty, and given the facts of this case, the court cannot find that the ALJ erred in his weighing of the opinion.  As the ALJ noted numerous times in his decision, the record reveals that Plaintiff has continued to engage in activities which are more strenuous than the light RFC assessed by the ALJ.  Plaintiff worked for almost two years after he allegedly became disabled in May 2007 at a job

which the ALJ found was more strenuous than the RFC assessed by the ALJ.  Plaintiff

continued to attempt to perform work as a handyman, and he continued to attempt to

engage in his contracting business, both of which are more strenuous than the RFC

assessed by the ALJ.  Given these facts, and given Mr. Geeting's statements that he does

not "have a long history" with Plaintiff, and that he has not "observed [Plaintiff] in very

many other activities," the court cannot find error in the ALJ's determination to accord

"little weight" to Mr. Geeting's opinion.

Plaintiff also claims the ALJ erred in according "little weight" to the opinions

expressed by Ms. King in her testimony at the hearing.  He points to Ms. King's opinion

that Plaintiff is no longer able to work an eight-hour workday (Pl. Br. 4), and argues that

the ALJ erred in understanding Ms. King's testimony to suggest that Plaintiff had

installed a sink and backsplash in her home, had run electrical wiring to her garage, and

had performed electrical work in her garage after his alleged onset date.  (Pl. Br. 22).  In

her response, the Commissioner recognizes that Ms. King provided a follow-up affidavit

indicating that the ALJ had mischaracterized her testimony, but the Commissioner argues

that the transcript "clearly shows" that Ms. King testified that Plaintiff did the work

discussed above after April, 2009.  (Comm'r Br. 19-20).

As the Commissioner acknowledged, Ms. King submitted an affidavit to the

Appeals Council stating that the ALJ had mischaracterized her testimony, and that the

countertop and sink at issue were installed and most of the electrical wiring was done at

her house in 2005.  (R. 274).  In his Reply Brief, Plaintiff once again argues that Ms.

King did not testify that the work discussed above was done after April 2009. (Reply 1-2). Plaintiff argues that the ALJ merely asked "what kind of things does [Plaintiff] do when he's at your house," and did not suggest a time frame for when those thing were done. (Reply 7). He also argues that the Commissioner misled the court in her Brief by suggesting that the hearing transcript shows that the work was done after April 2009. Id.

Because the hearing transcript is key to resolving this issue, the court reproduces the relevant portions here:

Q      So how long have you been -- so you've known each other since
       about 1989?

A      Since then, yeah.

Q      Okay. How often do you see one another?

A      We talk on the phone every night but I haven't been back here for a
       year. But he's come back to Saint Louis several times and helped
       me on things at my house in Saint Louis.

Q      Okay. Since 19 -- or since April, 2009, has he come back to your
       house to help you out?

A      Uh-huh.

Q      How often?

A      Oh, he's come back about three times a year or so.

Q      Okay. That's been a little over a year and a half so have you seen
       him four or five times?

A      Yeah.

Q      Okay. What kind of things does he do when he's at your house?

A    He's helped me with some electrical things and just honey-do things
     at the house.  He dropped in a sink in the kitchen and some backdrop
     on the kitchen counters and some stuff like that.

(R. 56-57).

The quoted portion of the transcript reveals that this line of questioning began with the ALJ asking Ms. King if Plaintiff had come back to her house to help her out since April 2009.  (R. 56).  Shortly thereafter, the ALJ noted that it had been a little over a year and a half since April, 2009 and asked if Plaintiff had been at her house about four or five times in that period.  Id.  Ms. King responded affirmatively.  Id. at 57.  Immediately thereafter, the ALJ asked what kinds of things Plaintiff does when he is at Ms. King's house, and she responded that Plaintiff had done some electrical things, dropped a sink in the kitchen, and some backdrop on the kitchen counters.  Id.  While the ALJ did not specifically ask what things Plaintiff had done since April 2009, in context, that is the time period with which he was concerned.  In these circumstances, it was reasonable for the ALJ to understand the testimony referred to work done since April 2009.

The ALJ's understanding of the time period at issue tended to be confirmed by an exchange just moments later:

Q    So when did -- when was the last time he did any work for you?

A    Let's see it was about-- let's see, this is November.  It was
     September.

Q    What did he do for you?

A    He worked -- the electricity went on in my garage and so he made
     the electricity come back.

31

| Q | Okay.  Did he have to run any wiring or put in any kind of -- |
|---|---|
| A | Yeah |
| Q | fixtures or anything? |
| A | He put in wiring. |
| Q | Where did he put the wiring in? |
| A | He put them from the house to the garage. |
| Q | Okay.  And how long was he there doing that job? |
| A | A week. |

(R. 58).  Ms. King's affidavit confirms that Plaintiff fixed the wire that broke between her house and garage in September 2010, and inspected her roof and replaced some felt on it in late 2009.  (R. 274).

The Appeals Council received Ms. King's affidavit and considered it when it denied Plaintiff's request for review of the ALJ's decision.  (R. 1-2, 4, 5).  In doing so, it found that "this information does not provide a basis for changing the Administrative Law Judge's decision."  (R. 2).  The court finds no error in this finding.  Although Ms. King clarified that certain of the work had been done before April 2009, she admitted that stringing the wire to the garage had been done in September 2010, and certain other work had been done it late 2009.  Even when considering only the work that was admittedly done after April 2009, it was apparently more strenuous than light exertional work, and supports the ALJ's finding that Ms. King's opinion that Plaintiff could not work a full workday "appears to concern [Plaintiff's] ability to work at a higher exertional level than

determined in the claimant's residual functional capacity," and supports his determination

to accord the opinion only "little weight." Ms. King's affidavit provided to the Appeals

Council does not require finding error in the ALJ's decision. The court finds no error in

the ALJ's evaluation of the lay opinions.

### C.    Medical Opinion Evidence

"Medical opinions are statements from physicians and psychologists or other

acceptable medical sources that reflect judgments about the nature and severity of [a

claimant's] impairment(s) including [claimant's] symptoms, diagnosis and prognosis."

20 C.F.R. § 404.1527(a)(2).  Such opinions may not be ignored and, unless a treating

source opinion is given controlling weight, all medical opinions will be evaluated by the

Commissioner in accordance with factors contained in the regulations.  Id. § 404.1527(d);

SSR 96-5p, West's Soc. Sec. Reporting Serv., Rulings 123-24 (Supp. 2012).  A physician

who treated a patient frequently over an extended period of time (a treating source)[4] is

expected to have greater insight into the patient's medical condition, and his opinion is

generally entitled to "particular weight."  Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir.

---

[4]The regulations define three types of "acceptable medical sources:"

"Treating source:"  an "acceptable medical source" who has provided the claimant
with medical treatment or evaluation in an ongoing treatment relationship.  20 C.F.R.
§§ 404.1502, 416.902.

"Nontreating source:"  an "acceptable medical source" who has examined the
claimant, but never had a treatment relationship.  Id.

"Nonexamining source:"  an "acceptable medical source" who has not examined
the claimant, but provides a medical opinion.  Id.

2003). But, "the opinion of an examining physician [(a nontreating source)] who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion." Id. at 763 (citing Reid v. Chater, 71 F.3d 372, 374 (10th Cir. 1995)). However, opinions of nontreating sources are generally given more weight than the opinions of nonexamining sources who have merely reviewed the medical record. Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004); Talbot v. Heckler, 814 F.2d 1456, 1463 (10th Cir. 1987) (citing Broadbent v. Harris, 698 F.2d 407, 412 (10th Cir. 1983), Whitney v. Schweiker, 695 F.2d 784, 789 (7th Cir. 1982), and Wier ex rel. Wier v. Heckler, 734 F.2d 955, 963 (3d Cir. 1984)).

When the Commissioner does not give controlling weight to a treating physician's opinion on the nature and severity of the claimant's impairment(s), she will apply certain regulatory factors used for determining the weight given all medical opinions. 20 C.F.R. § 404.1527(d)(2)(i, ii) & (d)(3-6). Those factors are: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. Id. at § 404.1527(d)(2-6); see also Goatcher v. Dep't of Health & Human Servs., 52 F.3d 288, 290 (10th Cir. 1995).

Here, the ALJ did not accord controlling weight to a treating source opinion. Rather, he applied the regulatory factors for weighing medical opinions and accorded "significant weight" to Dr. Wilkinson's and Dr. Coleman's non-examining source opinions. (R. 14, 19). Moreover, Plaintiff does not point to any treating source opinion or non-treating source opinion which is contrary to the opinion of Dr. Coleman and to which the ALJ should have accorded greater weight. Instead, he argues that "There is no way the RFC could have been assessed with medically founded information," because the RFC was completed in February 2010 and Plaintiff's lumbar x-ray done in April 2010 did not exist yet, and the lumbar MRI done in April 2008 was not in the possession of the Social Security Administration until provided by Plaintiff in August 2010. (Pl. Br. 20-21); see also (R. 510, x-ray report dated April 13, 2010); (R. 518-19, MRI report dated April 23, 2008, forwarded to SSA by Plaintiff in August, 2010).

As Plaintiff's Brief suggests, the RFC affirmed by Dr. Coleman was prepared by a single decisionmaker (SDM), Lori Denk, on February 11, 2010. (R. 499-506). As such it could not have been formulated after taking consideration of the x-ray report prepared on April 13, 2010, or the MRI report provided to the agency in August 2010. However, that fact does not mean that it was error to accord "significant weight" to the opinion of Dr. Coleman reflected in that RFC. On April 22, Dr. Coleman explained that he had "reviewed the previous medical evidence and the current medical evidence as well as the previous RFC," and affirmed that RFC. Since the x-ray report at issue was prepared on April 13, 2010, has a facsimile header indicating it was received at the "KS DDS" at

3:11PM on April 13, 2010, and appears in the administrative record before Dr. Coleman's opinion, it is apparent that it was in the "current medical evidence" reviewed by Dr. Coleman when he affirmed the RFC prepared by Ms. Denk. Therefore, the x-ray report was part of the evidence considered by Dr. Coleman in formulating his opinion. It is this opinion to which the ALJ accorded "significant weight." Plaintiff has shown no error in the ALJ's decision to accord "significant weight" to Dr. Coleman's opinion.

The fact that Dr. Coleman was unable to review the April 2008 MRI report provided to the agency in August 2010 in formulating his RFC assessment, does not mean that the ALJ's RFC assessment was formulated without consideration of the April 2008 MRI report. That MRI report was placed in the administrative record in August 2010. (R. 518-20). The ALJ formulated his RFC assessment "[a]fter careful consideration of the entire record," on January 28, 2011. Therefore, the MRI report was available to, and considered by, the ALJ when he formulated his RFC assessment. Although the ALJ's RFC assessment was identical to the RFC assessment affirmed by Dr. Coleman, that does not mean that it was based upon identical information or identical considerations. Plaintiff's argument assumes that the RFC assessed by an ALJ must be based upon an RFC assessed by some medical source. That is an incorrect assumption.

Although an ALJ is not an acceptable medical source qualified to render a medical opinion, it is "the ALJ, not a physician, [who] is charged with determining a claimant's RFC from the medical record." Howard v. Barnhart, 379 F.3d 945, 949 (10th Cir. 2004). "And the ALJ's RFC assessment is an administrative, rather than a medical

determination." <u>McDonald v. Astrue</u>, 492 F. App'x 875, 885 (10th Cir. 2012) (citing SSR 96-5p, 1996 WL 374183, at *5 (July 1996)).  Because an RFC assessment is made based on "all of the evidence in the record, not only the medical evidence, [it is] well within the province of the ALJ." <u>Dixon v. Apfel</u>, No. 98-5167, 1999 WL 651389, at *2 (10th Cir. Aug. 26, 1999).  Moreover, the final responsibility for determining RFC rests with the Commissioner.  20 C.F.R. §§ 404.1527(e)(2), 404.1546.

"[T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion." <u>Chapo v. Astrue</u>, 682 F.3d 1285, 1288 (10th Cir. 2012) (citing <u>Howard</u>, 379 F.3d at 949; <u>Wall</u>, 561 F.3d at 1068-69).  The RFC assessment required of an ALJ does not require citation to a medical opinion, or even to <u>medical evidence</u> in the administrative record for the RFC limitations assessed. <u>Castillo v. Astrue</u>, No. 10-1052, 2011 WL 13627, *11 (D. Kan. Jan. 4, 2011); <u>see also</u>, <u>Thongleuth v. Astrue</u>, No. 10-1101-JWL, 2011 WL 1303374, *13 (D. Kan. Apr. 4, 2011). There is no need in this case, or in any other, for the Commissioner to base the limitations in his RFC assessment upon specific statements in medical evidence or in medical opinions in the record.  They are based on his consideration of <u>all</u> of the record evidence.

Finally, Plaintiff does not point to evidence in the x-ray report or the MRI report which requires greater limitations than assessed by Dr. Coleman.  The x-ray report demonstrates "[d]egenerative sacroiliitis, mild," and "[s]pondylolysis with grade 1 spondylolithesis at L5-S1."  (R. 510).  The MRI report demonstrates "[d]egenerative disc disease at L5-S1 with a posterior disc bulge at this level," "[n]o focal disc herniation,

significant central spinal canal stenosis or neuroforaminal narrowing," and that "[o]sseous structures are intact." (R. 519). There is simply nothing in these reports which requires finding greater limitations than assessed by either Dr. Coleman or the ALJ. Absent citation to medical or legal authority, the fact that Plaintiff believes the reports demonstrate impairments which require a limitation to sedentary work is insufficient to show error in the ALJ's determination.

## VI. RFC Limitations

In the Commissioner's Brief, she describes Plaintiff's RFC arguments:

> Plaintiff argues that the [ALJ's] RFC assessment is unsupported by the medical evidence. See Pl.'s Br. at 19-20. Plaintiff also argues that the ALJ erred by failing to include specific limitations in the RFC based on asthma. See id. at 21. Plaintiff argues he is unable to perform light work and cannot perform his past relevant work. See id. at 13. Finally, Plaintiff argues that the ALJ should have found he could perform sedentary work and applied the Medical-Vocational Guidelines (Grids) to find him disabled. See id. at 14.

(Comm'r Br. 21-22).

Plaintiff's argument that the ALJ's RFC assessment is unsupported by the medical evidence was addressed in Section V(C) immediately above, wherein it was explained that an RFC assessment is based upon all of the evidence in the administrative record, and that there is no need for the Commissioner to base his RFC limitations upon specific statements in medical evidence or in medical opinions in the record. Plaintiff's argument that he cannot perform light work and should have been found disabled in accordance with the Grids because he is over age fifty, was addressed above at pages 13 and 14, in

Section III(B) analyzing the ALJ's step three determination. To the extent greater

analysis is required, Plaintiff simply has not directed the court's attention to record

evidence which requires a finding that he is limited to sedentary exertional level work.

With regard to Plaintiff's argument that he cannot perform his past relevant work, the

court notes that the ALJ specifically found that Plaintiff cannot perform his past relevant

work as he performed it. To the extent it was error for the ALJ to find that Plaintiff is

able to perform past relevant work as it is performed in the national economy, the court

notes that any error is harmless because the ALJ continued to step five of the sequential

evaluation process and made an alternative finding that other work is available in

significant numbers in the national economy that is within Plaintiff's RFC.

Plaintiff is correct that the medical evidence shows that he has asthma, and that no

more recently than 1989 while working at the Boeing Company it was determined that he

should not work around fumes, dust, or irritants. (R. 277, 286, 288, 289). However,

those restrictions were given long before the period at issue in this case, and Plaintiff

points to no record evidence demonstrating work limitations attributable to asthma during

the period at issue here. Plaintiff has shown no error in failing to include restrictions

resulting from asthma in the RFC assessment in this case.

In his Reply Brief, Plaintiff argues for the first time that his work at Sportsman's

Warehouse was not full time work and cannot support the RFC assessed by the ALJ.

Plaintiff's argument suffers from at least two failings. First and foremost, the ALJ

recognized that Sportsman's Warehouse suggested that a restriction to lifting 30 pounds

was a limitation in Plaintiff's job. (R. 18) (citing Ex. 6E. (R. 185-88)). Therefore, he recognized that Plaintiff's work at Sportsman's Warehouse exceeded the light exertional requirements of the RFC assessed by the ALJ, and found that Plaintiff could perform that work only as generally performed in the economy, but not as Plaintiff performed it at Sportsman's Warehouse. (R. 20). Second, work can be "substantial gainful activity" within the meaning of the regulations even if it is not performed full-time. Fowler v. Bowen, 876 F.2d 1451, 1453 (10th Cir. 1989) (quoting 20 C.F.R. § 404.1572). Here, Plaintiff acknowledges that his work at Sportsman's Warehouse constituted substantial gainful activity. (Pl. Br. 23-24) ("earnings in excess of $1,000 per month, which is sufficient to constitute substantial gainful activity"); (Reply 3) ("grossed slightly over substantial gainful activity").

Plaintiff's remaining arguments of error in the ALJ's RFC assessment essentially ask the court to reweigh the evidence and impose its judgment over that of the ALJ in this case. It may not do so. Bowman, 511 F.3d at 1272; Hackett, 395 F.3d at 1172. Plaintiff has shown no error in the ALJ's decision below.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the

fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's decision.

Dated this 24th day of June 2013, at Kansas City, Kansas.


s:/ John W. Lungstrum
**John W. Lungstrum**
**United States District Judge**